873 A.2d 1251

**In re KAELA C., Gunner C., and Franklin C.**

**No. 0808, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

May 5, 2005.

Reconsideration Denied May 27, 2005.

316

Brian L. Zavin (Nancy S. Forster, Public Defender, on brief), for appellant.

C.J. Messerschmidt (J. Joseph Curran, Jr., Atty. Gen., Darcy R. Massof, on brief), for appellee.

Panel ADKINS, BARBARA, SHARER, JJ.

ADKINS, J.

In child custody cases involving "extraordinary circumstances," Md. Rule 9–208(h)(2) authorizes a circuit court to issue an "immediate order" adopting the recommended findings and orders of a juvenile master, without having to wait until after the usual ten day period for parties to file exceptions to the master's report. When the court exercises its authority to act during the exceptions period, however, its custody order "remains subject to a later determination by the court on exceptions." *Id.*

The question of first impression we must decide in this appeal is whether such "immediate order" authority also may be exercised in a child in need of assistance (CINA) proceeding. In this instance, the court adopted the master's recommendations to sustain CINA allegations against a mother with custody of her three children, but ruled, pursuant to Md.Code (1974, 2002 Repl.Vol., 2004 Cum.Supp.), section 3–819(e) of the Courts & Judicial Proceedings Article (CJP), that these three children are not in need of assistance because there are no CINA allegations against their father, who is able and willing to take custody of the children.

We shall hold that, in such cases, the court has discretionary authority to enter an immediate order granting custody to the parent against whom there are no CINA findings, under Md. Rule 11–115(b). Such an order remains subject to any exceptions filed by the aggrieved parent against whom there are CINA findings because he or she may file exceptions to the master's report and recommendations, and obtain a *de novo* hearing on them, after entry of such an order.

## FACTS AND LEGAL PROCEEDINGS

Appellant Leslie C. and Christopher C. are the natural parents of nine year old Kaela C., six year old Gunner C., and four year old Franklin C. Gunner has been diagnosed as emotionally disturbed and in need of special education services.

Leslie and Christopher separated in 2001, and subsequently divorced. At the time this litigation began, the three children lived with Leslie in Frederick County while Christopher lived in Norfolk, Virginia, where he was on active duty in the United States Navy, stationed on the U.S.S. Ronald Reagan. Christopher had seen the children on only a couple of occasions during the previous two years, during which his military service included overseas and sea duty.

In the 19 months between May 14, 2002 and December 2, 2003, Child Protective Services (CPS) received five reports that Leslie abused and/or neglected one or more of the children. In the first ten months of that period, Leslie was alleged to have twice abused Kaela while disciplining her.[1] She agreed to a safety plan under which she would refrain from physically disciplining the children. Three more CPS reports followed, however, resulting in additional investigations and family services.[2] According to the Frederick County

---

1. On May 14, 2002, CPS found indicated physical abuse of Kaela because Leslie had dragged her across the floor, causing a shoulder injury. On March 19, 2003, CPS investigated a report that Leslie physically abused Kaela in a different incident, but that was unsubstantiated.

Leslie agreed to a safety plan after the first report and she was referred to the Family Advocacy Program at Fort Detrick. After the second report, Leslie signed a safety plan to refrain from using physical discipline on her children and agreed to work with Family Preservation Program "due to her past history and unrealistic expectations of her children."

2. On August 7, 2003, CPS received a report that Leslie neglected Gunner by "plac[ing] him in time-out outside during a violent storm consisting of rain, thunder and lightning." The report was unsubstantiated, but Leslie was named an alleged neglector.

On September 30, 2003, CPS received another report alleging physical abuse of Kaela. Kaela had dark circles under her eyes, but told her doctor "that she was not allowed to tell anyone how she got the circles under her eyes or she would be taken away."

On December 2, 2003, CPS received a report that Leslie slapped all three children in the face when she became upset with them. Kaela had slight bruising on her face around her nose but was not sure if it was from being hit. At that time, Gunner reported that when his mother got mad at him for not cleaning his room, she "made him stand outside in the dark in the rain."

Department of Social Services (FCDSS), Leslie eventually refused her caseworker's offer of services, refused to speak with investigators, and failed to follow the recommendations of the Family Advocacy Program at Fort Detrick, which provides services to families of military personnel.

In light of this history, a December 2 report of suspected abuse prompted CPS to place all three children in emergency shelter care. After hearings, and with both parents' agreement, the juvenile court authorized continued shelter care, but ordered that the children be sent to Christopher for an extended visit. Pending further proceedings, Leslie was allowed supervised visitation. She also agreed to participate in an update of a previous psychological evaluation.

In January 2004, FCDSS filed a petition asking the Circuit Court for Frederick County to declare the three children to be "children in need of assistance" (CINA) and recommending that they be placed together in foster care. All of the allegations related to instances of physical abuse or neglect by Leslie, except the last allegation, which asserted that Christopher was unable to care for the children because of "his military obligations and frequent long absences" as a result of his military duties.

An adjudicatory hearing was held before a juvenile master on March 3. At that hearing, Leslie agreed that the FCDSS could present evidence that would sustain the CINA allegations. Leslie proffered that she had attended an anger-management program and parenting counseling and that she preferred for the children to remain in foster care until they could be reunified with her. Christopher acknowledged that his military career prevented him from being able to have custody of the children.

On March 17, the case was called for a disposition hearing. By that time, the children had visited their father. At the outset of the disposition hearing, Christopher advised that his ship was being transferred to San Diego in May, and that he would like the court to award him custody of all three children. He represented that, with the Navy's permission, he

and his fiancee were traveling to San Diego in April to buy a house if he was granted custody. He also stated that he would be able to obtain shore duty and that the children could receive social services through the San Diego Family Advocacy Program.

Counsel for both FCDSS and the children concurred, on the basis of "the new evidence that [Christopher] is in fact now at disposition able to provide for [the children,]" that "continued placement in foster care for these children is [not] the best thing for them at this time." Counsel advised the court that Christopher's request for custody should be granted.

Leslie objected, arguing that Christopher's plans were just "highly speculative" "conjecture at this point." In her view, the children should remain in foster care with a reunification plan that would return them to her custody and care. The master postponed the disposition hearing in order for Christopher to "provide verification . . . that he will be granted shore duty if the children are placed with him" and to participate in a family assessment along with his fiancee.

On April 21, the parties returned to court for another disposition hearing. FCDSS presented a favorable family assessment recommending placement of all three children with Christopher due to his "proven track record of career stability, . . . exceptional performance record and . . . plans to . . . finish his [military] career on shore duty[.]" Counsel for both FCDSS and the children agreed with that recommendation. FCDSS and counsel for the children also informed the court that Gunner had been having such "severe behavioral problems" in foster care that he was "probably go[ing] to be removed today," resulting in separation of the siblings and further trauma to them.

Leslie again objected, repeating her preference to have the children remain in foster care in order to give her "an opportunity to reunite" with them. Her counsel pointed to the continuing lack of proof that Christopher actually would be granted shore duty, and emphasized that there would be no one to care for the children if Christopher was absent.

The master concluded that the CINA petitions should be dismissed because Christopher is able and willing to take custody of all three children. At that point, counsel for FCDSS asked the master to recommend an immediate custody order:

> [Counsel for FCDSS]: Your Honor, can **we request** that the Court's order, I forget the language and I know it's questionable whether it can be done, but **that the Court's order become an immediate order pending the exceptions hearing.**
>
> The Master: Actually I think I can do that.
>
> (Brief pause.)
>
> [Counsel for Leslie]: I ... would object to that, Your Honor.
>
> The Master: Okay. [Counsel for Christopher and the children], do you wish to be heard?
>
> [Counsel for Christopher]: ... [W]e support the Department's position, Your Honor.
>
> [Counsel for the children]: As do I, Your Honor.
>
> (Brief pause.)
>
> The Master: **I will recommend in light of the imminent necessity to remove Gunner from his home, ... and pursuant to Maryland Rule 9–208(h)(2) as well as the CINA provision of the Courts and Judicial Proceedings [Article] which indicate that when the placement of the child is changed, the Master can recommend that the ... Court adopt that recommendation immediately. I will also recommend that my ... recommendations be adopted immediately. But certainly counsel would be entitled to a hearing on that** and that will conclude these matters.... (Emphasis added.)

Leslie did not request a hearing on the issue of whether the juvenile court could or should issue an immediate order transferring custody to Christopher.[3]

---

3. Approximately 20 minutes after the April 21 disposition hearing concluded, the master addressed counsel for FCDSS and Christopher on the record, although Leslie and her counsel were not present.

Two days after this hearing, the master issued her written recommendations. On that same day, the Circuit Court for Frederick County, sitting as a juvenile court, adopted the master's recommendations. The juvenile court ruled that "the children are not in need of assistance" because their "father is available, able and willing to care for the[m.]" It also found that "the children have poorly adjusted to their placement in foster care and it is in their best interests to be placed with their father immediately," given that "Gunner's current foster care placement is jeopardized due to his poor behavior[.]" Concluding that "extraordinary circumstances exist pursuant to Md. Rule 9–208(h)(2)[,]" the court dismissed the CINA petitions and awarded custody of all three children to Christopher. Leslie was granted "reasonable and liberal visitation with the children."

Leslie did not file exceptions to the master's recommendations, believing that her opportunity to do so had been foreclosed by the juvenile court's order. Instead, Leslie appealed the order, raising two issues for our review, which we restate as follows:

I. In a CINA proceeding adjudicated before a juvenile master, may the juvenile court enter an order awarding custody to a parent against whom there are no CINA findings before the period for filing exceptions to the master's recommendations has expired?

II. Did the juvenile court deprive Leslie of her right to file exceptions to the master's CINA recommendations?

---

The Master: [Counsel], on the C. case ... I will ask that you tell [Leslie's counsel] that I said this. I did find extraordinary circumstances under both CJ and the Family Law Article and ... the way I read at least the Family Law Article, and I have to find the specific section of the CJ that I'm relying on, if the Court is to adopt my recommendations, parties are afforded the opportunity to have a hearing on whether or not those recommendations should be adopted immediately. So if any party is desirous of having a hearing on that then they need to request, contact my office and I'll likewise let Judge Dwyer know. Okay? That's all I wanted to say. (Emphasis added.) Counsel for Leslie denies receiving any such message.

## DISCUSSION

### I.

### Immediate Custody Orders When Juvenile Court Exercises Authority Under CJP Section 3-819(e)

### A.

### Award Of Custody To A Non–CINA Parent

This appeal revolves around the interplay between several rules and statutes pertaining to CINA petitions and child custody orders. We review these to lay the foundation for the issue presented by this case.

This litigation began with a CINA petition. Maryland's circuit courts, sitting as juvenile courts, have "exclusive original jurisdiction over ... [p]roceedings arising from a petition alleging that a child is a CINA[.]" CJP § 3–803(a)(1).

The CINA subtitle permits the juvenile court, after an adjudicatory hearing on the allegations in a CINA petition, to conclude that the child is not in need of assistance because he or she has a viable option to live with a suitable parent against whom there are no findings of abuse or neglect. In such cases, at the disposition hearing on the CINA petition, the juvenile court may find that "the allegations in the [CINA] petition are sustained against only one parent of a child, and there is another parent available who is able and willing to care for the child[.]" CJP § 3–819(e). In these circumstances, **"the court may not find that the child is a child in need of assistance, but before dismissing the case, the court may award custody to the other parent."** [4] CJP § 3–819(e)(emphasis added). In addition to exclusive jurisdiction over the CINA proceedings, juvenile courts have concurrent jurisdiction over "custody of a child alleged to be a CINA

---

4. For clarity, we shall distinguish between the parent against whom CINA allegations are sustained and the "other parent" who is awarded custody under CJP section 3–819(e) by referring to them as the "CINA parent" and the "non-CINA parent."

under circumstances described in [CJP] § 3–819(e)[.]" CJP § 3–803(b)(1)(ii).

Juvenile masters may assist a juvenile court in CINA cases, but may not make the ultimate decision as to whether the allegations in a CINA petition are sustained, whether the child is in need of assistance, or whether one parent should be awarded custody under CJP section 3–819(e). *See* CJ § 3–807. The master conducts hearings, then issues written "findings of fact, conclusions of law, and recommendations as to an appropriate order." CJP § 3–807(b)(2).

At that point, "[a]**ny party, in accordance with the Maryland Rules, may file written exceptions to any or all of the master's findings, conclusions, and recommendations**," and "may elect a hearing de novo or a hearing on the record before the court." CJP § 3–807(c)(emphasis added). "**[I]n the absence of timely and proper exceptions**," the master's proposed findings, conclusions, and recommendations "may be adopted by the court and appropriate orders entered based on them." CJP § 3–807(d)(2)(emphasis added).

As stated in CJP section 3–807, the procedure for challenging a master's recommendation to award custody to a non-CINA parent is established in the Maryland Rules, and more specifically, within Title 11 governing proceedings in juvenile causes, including petitions to declare a child to be in need of assistance. *See* Md. Rules 11–101(b)(1), 11–103(a). After the master hears a CINA petition, he or she submits a written report to the juvenile court, consisting of "proposed findings of fact, conclusions of law, recommendations and proposed orders with respect to adjudication and disposition." Md. Rules 11–111(b), 11–115(b).

At that point,

[a]**ny party may file exceptions to the master's proposed findings, conclusions, recommendations or proposed orders.** Exceptions shall be in writing, filed with the clerk **within five days after the master's report is served** upon the party, and shall specify those items to which the party

excepts, and whether the hearing is to be de novo or on the record.

Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions. An excepting party other than the State may elect a hearing de novo or a hearing on the record. . . .

Md. Rule 11–111(c)–(d).

With this procedural background, we turn to the question presented by this case—whether a juvenile court exercising its authority to award custody to a non-CINA parent under CJP section 3–819(e) may enter a custody order before expiration of the period during which the CINA parent may file exceptions to the master's recommendations.

## B.

### Authority To Enter Custody Order Before Exceptions Period Expires

Both the master and the juvenile court relied on Md. Rule 9–208(h)(2) in answering this question. That rule allows a juvenile master to recommend, and juvenile courts to enter, an immediate child custody order in "extraordinary circumstances." Md. Rule 9–208 applies to child custody matters that have been referred to juvenile court masters. An aggrieved parent has **"ten days** after recommendations are placed on the record" to file exceptions to the master's custody recommendations. *See* Md. Rule 9–208(f). Such exceptions are adjudicated on the record made before the master or upon "an agreed statement of facts[,]" "unless the court determines that . . . additional evidence should be considered." Md. Rule 9–208(g)–(i). As a general rule,

> the court shall not direct the entry of an order or judgment based upon the master's recommendations until the expiration of the time for filing exceptions, and, . . . if exceptions are timely filed, until the court rules on the exceptions[.]

Md. Rule 9–208(h)(1)(A)(emphasis added).

The Court of Appeals, however, has recognized that there are instances when it is not in the best interest of a child for

the circuit court to await the expiration of a potentially protracted exceptions period. In such cases, the Court has authorized entry of an immediate child custody order:

(2) **Immediate Orders.** ... If a master finds that extraordinary circumstances exist and recommends that an order be entered immediately, the court shall review the file and any exhibits and the master's findings and recommendations and shall afford the parties an opportunity for oral argument. **The court may accept,** reject, or modify **the master's recommendations and issue an immediate order. An order entered under this subsection remains subject to a later determination by the court on exceptions.** (Emphasis added.)

Md. Rule 9–208(h)(2).

Leslie argues that the master and juvenile court erred in relying on Rule 9–208(h)(2) because Title 9 of the Maryland Rules governs "divorce, annulment, alimony, child support, custody or visitation," but, by its own terms, "do[es] not apply to actions in a juvenile court[.]" Md. Rule 9–201. In her view, because the CINA proceedings concerning her children were "actions in a juvenile court," the court did not have authority to issue an immediate custody order under Rule 9–209(h)(2).

FCDSS concedes that Rule 9–208(h) "is not directly applicable to" CINA proceedings, but argues that the juvenile court nevertheless had authority to enter an immediate custody order because, in addition to exercising the special jurisdiction of a juvenile court over the CINA proceedings, the circuit court also was exercising concurrent jurisdiction over the child custody issue. Alternatively, the local department asserts that,

nothing in the CINA statute or rules prohibits the juvenile court from making its orders effective during the pendency of hearings on exceptions to a master's recommendations, just as a court dealing with the custody of children who have not been alleged to be CINA may determine custody pendente lite. The purpose of the CINA provisions is to

protect children who have been subjected to or are at risk of abuse or neglect. It cannot be supposed that the General Assembly or the Court of Appeals intended courts whose special focus is on those children to have less power to act in their best interest than courts of general equity. (Citations omitted.)

We agree with Leslie that the master and juvenile court erred in concluding that Rule 9–208(h)(2) applies in these juvenile proceedings, because the Title 9 rules patently "do not apply to actions in a juvenile court." Md. Rule 9–201. Even though a juvenile court has concurrent jurisdiction for purposes of awarding custody in a section 3–819(e) case, the court is still sitting as a juvenile court when it exercises such jurisdiction. FCDSS's construction of the rule would require us to read into Rule 9–201 an exemption for custody actions in a juvenile court. We decline that invitation to redraft the Court of Appeals' language. For that reason, we reject FCDSS's concurrent jurisdiction argument.

■ Nevertheless, we conclude that a juvenile court may adopt and implement a master's recommendation that custody be granted immediately to a non-CINA parent before the exceptions period for the CINA parent has expired. As discussed below, we find authority for an immediate custody order within the undisputedly applicable rules in Title 11.

As we have noted, Title 9 of the Maryland Rules governing civil custody cases establishes a general rule that a circuit court cannot issue a child custody order during the ten-day waiting period following a master's custody recommendation, and an accompanying exception permitting such an order in extraordinary circumstances. *See* Md. Rule 9–208(h)(2). There is no counterpart for this general prohibition and exception in the Title 11 Rules that apply in juvenile court. Specifically, Md. Rules 11–111 and 11–115(b), governing the disposition of juvenile cases, do not explicitly prohibit a juvenile court from issuing an order before the five-day exceptions period following the master's recommendations. Nor does either rule state that the court may issue an immediate order

in language similar to the immediate order subsection in Rule 9–208(h)(2).

Instead, Rule 11–115(b) provides that "[a] **commitment recommended by a master is subject to approval by the court in accordance with Rule 11–111, but may be implemented in advance of court approval.**" (Emphasis added.) The term "commitment" is not specifically defined by statute or rule. But that noun is derived from the verb "commit," which the General Assembly defines broadly in the CINA Subtitle to mean "to transfer custody." *See* CJP § 3–801(h).

█ This definition applies to Title 11 rules. *See* Md. Rule 11–101(a). For example, the term "commitment" refers to transfers of child custody to a local department of social services and to the Department of Health and Mental Hygiene. *See* Md. Rules 11–115(c), 11–115(d). We construe "commitment" as also encompassing a transfer of custody to the non-CINA parent under CJP section 3–819(e). This definition is consistent with the General Assembly's direction in CJP section 3–819 that, if a juvenile court finds a child to be in need of assistance, it may "[c]ommit the child to the custody of . . . a parent . . . on terms the court considers appropriate[.]" CJP § 3–819(b)(2)(ii).

Our construction dovetails with the Rule 11–111(b) and (c) provisions governing review by the court if exceptions are filed or are not filed. Under those rules, a CINA parent who wishes to file exceptions to the master's recommendations may do so within five days after the master's report is served, and may obtain either a de novo hearing or a hearing on the record. As stated in Rule 11–115(b), the master's commitment recommendation remains "subject to approval by the court in accordance with Rule 11–111," including the provisions affording an aggrieved parent the right to file exception, even if it is "implemented in advance[.]"

█ In this instance, therefore, the "commitment recommended by [the] master" was a "transfer of custody" from the local department of social services to the non-CINA parent who previously did not have custody. Under Md. Rule 11–115(b), the master's recommendation could "be implemented

in advance of court approval." There were undisputedly grounds to do so in this case.

The evidence showed that, at the disposition hearing when the master orally announced her recommendations, Gunner was in distress and imminent danger of being removed from his foster home. If custody was not immediately awarded to Christopher, counsel for FCDSS, the children, and Christopher agreed that Gunner and his siblings were likely to suffer separation and adjustment trauma.

Moreover, there were no accompanying issues to complicate the court's expedited order. The master's recommendation that custody of the children be transferred to their father was the sole issue presented to the juvenile court for its approval. At the adjudication hearing, Leslie acknowledged that FCDSS had sufficient evidence to sustain the CINA allegations against her. When it became clear at the March 17 hearing that Christopher was "willing to care for" the children, Leslie had only one issue left on which she could challenge a transfer of custody to Christopher—whether there was sufficient evidence that he would be "able" to care for them. *See* CJP § 3–819(e).

In these circumstances, Rule 11–115(b) allowed the master's custody recommendation to be "implement[ed] .... in advance of court approval." We agree with FCDSS that, among those authorized to implement the recommendation was the juvenile court itself. Thus, the juvenile court had authority under Md. Rule 11–115(b) to order a transfer of custody to Christopher before Leslie could file exceptions to the master's recommendations, though the order remained subject to any exceptions that Leslie might file in accordance with Rule 11–111. We therefore hold that the juvenile court did not err in ordering that custody of all three children be transferred to Christopher before the exceptions period expired.

## II.

### Right To File Exceptions

■ Although Leslie never attempted to file exceptions to the master's recommendations, she complains that the juvenile court's order denied her any meaningful opportunity to do so,

thereby forcing her ultimately to litigate in California. We explained in Part I that the juvenile court had authority to implement the master's custody recommendation before the five day exceptions period expired. Consequently, its mistake regarding the source of this authority does not invalidate the custody order. Nor does it otherwise require us to vacate that order unless it misled Leslie into believing that she could not file exceptions to the master's CINA recommendations once that order was issued. We are not persuaded that it did.

The record before us conclusively shows that the erroneous reliance on Md. Rule 9–208(h)(2) did not cause or contribute to Leslie's failure to file exceptions. When counsel for FCDSS first requested an immediate custody order at the April 21 disposition hearing before the juvenile master, she asked that "the Court's order become an immediate order **pending the exceptions hearing.**" (Emphasis added.) Moreover, both the master and the juvenile court cited and relied on Md. Rule 9–208(h)(2), which states that "[a]n **order entered under this subsection remains subject to a later determination by the court on exceptions.**" (Emphasis added.)

Thus, rather than misleading Leslie, the erroneous reliance on Md. Rule 9–208(h)(2) actually ensured that Leslie and her counsel were on notice that she was entitled to file exceptions to the master's CINA recommendations following the juvenile court's order. Given the court's explicit citation of Rule 9–208(h)(2), we presume that if Leslie had attempted to file exceptions, the juvenile court would have permitted her to do so.

Consequently, we find no merit in Leslie's complaints that she has been denied due process, deprived of a meaningful opportunity to file her exceptions, and unfairly forced into a new jurisdiction. Leslie was neither misled nor prejudiced by the erroneous reliance on Rule 9–208(h)(2) by the master and the juvenile court. In failing to file exceptions, Leslie assumed the risk of what happened here—that, if she was wrong about her contention that the court could not award custody during the exceptions period, she would waive any exceptions she might have.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**